Opinion delivered March 20, 1889.

No. 2958.

JEFF CLARK *v*. THE STATE.

1. EXTRA TERRITORIAL OFFENSES — THEFT — EVIDENCE. — This was a prosecution for theft — the indictment charging the theft of three horses in the Cherokee Nation and the bringing of the same into this State. The contention of the defense was that, inasmuch as under an act of the Congress of the United States a white man can not be prosecuted to conviction and punished for a theft committed in the Indian Territory except in the United States courts, he can not be prosecuted to conviction in this State for the theft of property in the Indian Territory, as theft is defined by the law of said Territory, and the bringing of the same into this State; that, as no act can constitute an offense unless a penalty for the commission thereof is provided, and as, un-

der the act of Congress, a white man is not amenable to the law of the Indian Territory for theft, he can not within the purview of that law commit theft, it follows that he can not be prosecuted in this State under articles 798 and 799 of the Penal Code, and therefore the trial court erred in admitting in evidence the statute of the Cherokee Nation defining theft of live stock. *Held*, that the defense can not be maintained. The rule is that if a person commits in another State or Territory acts which, if committed in this State, would be theft, and the said acts constitute theft under the laws of the said State or Territory, and he subsequently brings the stolen property into this State, he can be prosecuted in this State and punished as if the theft had been committed in this State. The statute of the Cherokee Nation, admitted in evidence over objection, excepts no race nor class from its operation and clearly defines the offense of theft with penalty annexed, and it was properly admitted in evidence. See the opinion in extenso on the question.

2. Same — Charge of the Court. — The laws of the Cherokee Nation being in evidence, the trial court instructed the jury that, under said laws, certain acts constituted theft, and left it to the jury to determine from the evidence whether the defendant committed such acts. *Held*, sufficient; and that the court did not err in failing, in its charge to the jury, to define and construe the laws of the said Nation.

3. Same—Possession of Recently Stolen Property.—See the opinion in extenso for a charge of the court upon the question of the possession of recently stolen property, etc., *held* correct and responsive to the proof.

Appeal from the District Court of Tarrant. Tried below before R. J. Boykin, Esq., Special Judge

The indictment in this case, which was framed under articles 798 and 799 of the Penal Code, charged that the appellant did fraudulently take, steal, and carry away from the possession of G. W. Montgomery, in the Cherokee Nation, Indian Territory, who was holding the same for the owner, S. S. Cobb, three certain horses, with the intent, etc.; which said acts, by the law of the said Cherokee Nation, then in force, did constitute the offense of theft; and that thereafter he brought the said horses into the county of Tarrant, State of Texas. Under this indictment the appellant was convicted of theft, and his penalty was assessed at a term of five years in the penitentiary.

. S. S. Cobb was the first witness introduced by the State. The material facts to which he testified were that he lived on his ranch in the "Cherokee Strip," in the Cherokee Nation; that the horses mentioned in the indictment belonged to him, but, when taken, were in the possession of his agent, Mont-

gomery; that the same were taken by some person unknown to him, and without his consent, about the time alleged in the indictment—May 5, 1888—and that he subsequently recovered two of the said horses in the city of Fort Worth, Texas.

G. W. Montgomery testified, for the State, in substance, that he lived at Cobb's ranch in the Cherokee Strip, and, in the absence of Cobb, exercised control over the said ranch and the stock appertaining thereto. The defendant, whom the witness had known for eighteen months, and who, during that time, had worked on a ranch adjoining the Cobb ranch, in the Cherokee Strip, spent the night of May 5, 1888, with the witness at the said ranch, leaving there late on the next evening, and going in a westerly direction. Three of Cobb's horses failed to return to the ranch on that night, and on the next day the witness instituted diligent but unsuccessful search for them. He found the south gate of the pasture open, and that the said three horses and others had left the pasture through that gate. Witness recovered all but the three horses mentioned in the indictment. Subsequently Mr. Cobb recovered two of the last mentioned horses in the city of Fort Worth. The said three horses were taken without the knowledge or consent of the witness.

T. F. Walker testified, for the State, that he lived in Fort Worth, Texas, and was the proprietor of the Central wagon yard, on Main street, in that city. Between ten and eleven o'clock on the morning of May 17, 1888, the witness met the defendant on Houston street, in Fort Worth, on which occasion the defendant told witness that he wanted to sell the horse he was riding and another horse which he had just left in the witness's wagon yard. Witness replied that buyers could be readily found in Fort Worth, and that if the animals upon inspection suited him, he might, perhaps, purchase himself. Witness and defendant then went to the wagon yard, where the defendant pointed out the second horse, and witness offered him fifty dollars for the two. The defendant replied that he would not take less than one hundred dollars for them. The witness then asked him where he got the animals, and he replied that he got them in a trade with a hired hand of one B. C. Evans, a cow man, who, he said, lived ten or twelve miles northwest of Aurora, in Wise county, Texas—Aurora being about twenty-five miles northwest of Fort Worth. After a prolonged conversation, the witness offered the defendant sixty dollars for

the two horses, and he agreed to sell them to the witness for that price. The witness then declined to purchase until the defendant should satisfy him as to his title to the said horses. Defendant then said that he would go up town and see if he could find an acquaintance from Wise county through whom he could satisfy witness. After a prolonged absence he returned and reported that he could find nobody from Wise county. The witness again declined to purchase until satisfied about the title. The defendant then proposed to leave one of the horses in the custody of the witness, and on the other to go to Decatur in Wise county to arrange the necessary proof of title. He proposed that if he should satisfy the sheriff of Wise county and the Decatur bank about his title he would deliver the horse ridden off by him to the said sheriff for the witness, if witness would remit him the purchase money through the said Decatur bank. To this proposition the witness agreed, and defendant left witness a short while before sundown, ostensibly to go to Decatur, which was about twenty-five miles distant. His horse was then very much jaded, and at that time he had no slicker. It rained during the said night. At about six o'clock on the next morning the defendant came to witness's wagon yard and handed witness the note now offered in evidence. Substituting spaces for hieroglyphics—the design of a heart above a cross—the note reads as follows:

"Mr Walker, those horses that Mr Clark sold to you is all right. I will bee responsible for them. One black horse, brand —— and G on left sholder E on thigh. Bay —— circle Z on left sholder E on thigh.

"B. C. Evans."

The witness exhibited the note to several citizens of Fort Worth, including the merchant of that name, and inquired if they knew such a man who resided in Wise county. The witness then returned the note to defendant, telling him that he was not satisfied with the showing of title. Defendant told witness that he went to see Evans during the night, and got him to write the note. His horse did not look any more jaded on that morning than he did on the night before, and showed no evidence of travel during the preceding night. Witness then reported the matter to officer Witcher. Subsequently witness turned the horses over to S. S. Cobb.

Officer Witcher testified, for the State, that the witness Walker, on the morning of June 18, 1888, informed him about the defendant having two horses in his, Walker's, wagon yard, and witness went to the said yard to investigate the matter. He asked defendant if he had any horses for sale. Defendant replied that he had two, and showed them to witness. Witness asked him for his bill of sale. He replied that Walker had it; that he went to see Evans on the night before and got him to write it. He said that he got the horses from a man in the employ of Evans. Witness then asked him if he made the trip to Evans's house in one night. He replied that he did not have to go all the way to Evans's house, as he met Evans between Aurora and his home between mid-night and one o'clock, when Evans, by light of a buffalo chip fire, wrote the note. The witness then arrested defendant and took him to the calaboose. Upon searching him he found the Evans note in a pass book in his pocket. The note showed to have been written on a leaf torn from that book. The defendant's horse—the one he claimed to have ridden to Wise county on the night before,—showed no sign of having made the trip. The roads between Fort Worth and Aurora were very bad in wet weather, and there was a rainfall on the said night.

R. H. Tucker, a hand-writing expert, was next introduced by the State. After comparing the note in evidence, purporting to have been signed by B. C. Evans, with two of the defendant's acknowledged signatures, he testified that the said note was evidently written by the defendant.

The State next introduced in evidence the following extract from the laws of the Cherokee Nation: "Every person who shall wilfully take or steal a horse, mule, ass or cow, shall be deemed guilty of a felony, and upon conviction be imprisoned not less than three years nor more than seven years, and be fined for the benefit of the injured party in a sum double the amount of loss or damage sustained. And every person found a second time guilty of a violation of this section, shall be imprisoned not less than seven nor exceeding ten years, and be fined as above."

The State closed.

Sam Murrell, the brother-in-law of the defendant, testified, in his behalf, that he, witness, lived in Cooke county, Texas. Defendant left witness's house about two weeks before his arrest upon this charge. He was then riding his own horse, worth about seventy-five dollars, and had seventy dollars in money.

During the larger part of the three or four years preceding the arrest of defendant, he, defendant, worked with cattle in the Indian Territory. Witness knew a man named B. C. Evans, who claimed to live in Wise county, and had seen that man in Wise county. He considered that man a "bad egg."

The two remaining witnesses testified that ·they were acquainted with the reputation of the defendant for honesty, etc., and that it was good.

*C. B. Stuart*, for the appellant: I desire to call the attention of the court to that assignment of error which relates to the question as to whether or not a white man can commit the offense of theft against the laws of the Cherokee Nation. The other assignments are fully relied on by appellant, but do not, we think, need discussion, as they are both based upon elementary principles of law with which the court is, of course, familiar. The question then recurs: "Can a white man commit the offense of 'theft' against the law of the Cherokee Nation?" or "would the 'act' committed by appellant be theft under the laws of the Cherokee Nation?" These questions embrace both phases of our statute, and to our minds admit of but one answer.

Of course it will be conceded by the State that a white man can not be *punished* or *charged with crime* under the penal laws of the Cherokee Nation or any other portion of the Indian country. The decisions cited by appellant in his brief are conclusive of this point; and besides, it is so well settled by the courts of the country, and is so universally recognized and conceded both by the Indian and the Federal authorities, that any attempt to further discuss this branch of the subject would be a direct thrust at the intelligence of this court. Any lawyer who is familiar with the political relations of the Indian country to the United States, and who will examine the Federal Statutes and treaties, will conclude in a moment that white men are not within the purview of the penal statutes of the Indian country. (Rev. Stats. of The United States, secs. 2145, 2146, 5356; 4 Howard, 567; 47 Wis., 296; 7 Fed. Rep., 894; 20 Id., 299.)

If, then, a white man can not be charged with crime under the laws of the Cherokee Nation, and can not be punished for an offense against such laws, can he commit an *"act"* which would be "theft" under their laws? Clearly not; because, in.

the first place, if there is no *offense there is no crime,* and where there is no *punishment* there is, in legal contemplation, no *crime* or *offense:* and because, in the second place the Indian laws have no reference to white men—were not made for their benefit, and were never intended to affect them in one way or the other. Such laws stand as if white men were, by *positive statute of the Cherokees, excepted* from the operation of such laws. The Federal Statutes and decisions both declare that white men are wholly unaffected by Indian laws, and, therefore, when the Cherokee Statute declares that "any person" who commits certain acts shall be guilty of theft, it means, of course, "any person" who is within the purview of such law, or who is embraced within its meaning. A white man can not be brought within the spirit and meaning of such law, because the Federal Statutes say he can not.

It follows, therefore, irresistibly, as a logical conclusion, that the penal laws of the Cherokee Nation, are, as to white men, *no laws at all,* and stand as to such white men *as if they never were enacted.* Thus the position that a man can commit an offense against a law which has no existence is reduced to a logical absurdity. Our statute under which this prosecution is brought declares that, in order for the defendant to be convicted in this case, the "act" committed by him in the Cherokee Nation must have been an *offense* against its laws. The indictment charges the offense against the *"Cherokee Laws,"* and hence the proof must correspond with that allegation. The "act," under the indictment, can not be shown to be an offense against any other law, because there is no allegation to that effect. The defendant is here to meet the charge as made by the indictment. The law requires him to do no more.

In order to comprehend more fully the meaning of our statute which is applicable to this cause, it is well to look to the public policy which gave rise to its enactment. It is clear, at a glance, that the legislature, in passing this statute, intended to punish those offenses only which were *penal* in the jurisdiction where the *initial act* was committed. Why do I say this? Because the statute declares that, in order to hold the defendant for theft here, the "act" must have been theft in the "foreign country, State or Territory" from which the property is brought. If the defendant has committed no act for which he may be punished in the foreign jurisdiction, then he has committed no offense against the penal law of that jurisdiction,

however much he may have transgressed the Divine Commands. It is true the Cherokee law denounces theft and prescribes a punishment. But it doesn't apply to the white man. Therefore I say that the act of the defendant was not "theft" within the meaning of our statute. Whoever heard of a statute in reference to theft which did not prescribe a punishment? In legal contemplation where there is no punishment there is no theft. Wouldn't it be a foolish thing (it would certainly be an unlawful one) for the Texas legislature to pass a statute punishing a man for doing something in another State for which he could not be held or charged, or punished, in such latter State. Such a law would be the refinement of absurdity. It is needless to say more. Men can not demonstrate axioms. The "self evident" does not come within the legitimate domain of logic. When the concession is made, as it must be, that a white man can not be punished or charged under the Cherokee laws, it seems to me that the battle is won. This question is of the highest and most vital importance. It will be of frequent recurrence, and hence requires a most careful investigation.

The proper construction of the statute under which this prosecution is pending is one, it seems to me, of very little practical difficulty. It is the first time that the question has ever been pointedly before this court, and in reaching a conclusion the court should, it seems to me, look to the policy of the law and its spirit; for these are the cardinal points from which the investigation should begin. Nor should the court be unmindful of the opinion of the legal profession in Texas upon this point, which is, as far as I know, unanimous in its indorsement of the position contended for in this cause by appellant.

*W. L. Davidson,* Assistant Attorney General, filed an able brief and argument for the State.

HURT, JUDGE. This is a conviction for the theft of a horse in the Cherokee Nation, Indian Territory, and bringing the same into Tarrant county, Texas, the prosecution being under articles 798 and 799 of the Penal Code.

There was no error in receiving in evidence the laws of the Cherokee Nation, unless the fact that appellant is a white man defeats the prosecution. Hence the question is, under the provisions of the above articles of our code, construed with reference to the laws of the Cherokee Nation and the acts of

Congress bearing upon this matter, can a white man be legally prosecuted to conviction for stealing in said Nation, and bringing the stolen property into this State? The counsel for appellant, in a masterly argument, contends that a white man can not commit the offense of theft against the laws of the Cherokee Nation; or, to present the question in another form, that the act committed by appellant would not be a theft under the laws of the Cherokee Nation; that, as a white man can not be punished for violating any law of the Nation, but is punishable for his acts committed in the Nation by the federal courts, and punished because such acts have been denounced as an offense by an act of Congress, the articles of our code cited can not apply to or embrace white men.

This is a plausible, yea, a strong position, and was supported at Tyler by a most cogent argument by Mr. Stuart. It is contended that, though the acts committed by appellant are forbidden by positive law (of the Nation) with punishment annexed on conviction, yet as appellant, because a white man, could not be punished under the said law, therefore he could not commit the offense in the Territory as required by article 798. This article must be construed in connection with article 799, which reads as follows: "To render a person guilty under the preceding article it must appear that, by the law of the State or Territory from which the property was taken and brought to this State, the *act* committed would also have been robbery, theft or receiving stolen goods." The *act* must appear to be theft by the law of the Territory.

Did it so appear? This is not denied by appellant, but he replies through counsel that he can not be punished under the territorial laws, and where there is no punishment there can be no offense. The law of the Nation is broad and comprehensive in its terms. It says: "Every person who shall wilfully take and steal a horse," etc. It is not confined to Indians, nor does it except from its operation white men. An indictment against an Indian, to be sufficient, would not have to allege that the accused was an Indian, or negative that he was a white man. Therefore, whether the act, theft, be committed by an Indian or white man, it is forbidden by positive law, and there is annexed, on conviction, a prescribed punishment. The language of the act of the Territory is not such as makes the fact that the person was an Indian an element of the offense. If this had been the case, no person except an Indian could

have been guilty, though he may have committed all the acts denounced as theft. But the law is not thus written; it embraces every person, white, black, or Indian. The act committed by appellant therefore was, by the law of the Territory, theft.

But, says counsel for appellant, it was not theft in appellant, because for want of jurisdiction, the courts of the Territory could not punish him. The act of the Territory defining theft embraces every person, and there is punishment annexed to its violation. This is not a case in which the law denounces acts as a crime, but fails to annex a penalty to such crime. To the contrary, all persons are embraced, and for a violation a penalty is prescribed. How, then, does the fact that appellant can not be punished under the Territorial law negative or refute the conceded actual facts, viz: That he, in fact, did commit an act in said Territory; that the act committed was theft, and that it was theft by the law of said Territory, whether committed by an Indian or white man? If the act committed is theft by the law of the Territory, and is theft here, and the stolen property is brought to this State, the party should have been convicted whether he could have been punished under the laws of the Territory or not. This is our deliberate conclusion after mature reflection.

Second assignment. The court erred in not defining and construing in its charge to the jury the law of the Nation, and in leaving the question to be determined by the jury without appropriate instructions. In this there was no error. The laws of the Nation were introduced in evidence. The court should have instructed the jury that certain acts, by said laws, constitute theft, leaving it to the jury to determine whether the defendant was guilty of such acts, and this was done by the court. But suppose the matter was left to the jury and they held that said acts did, by the laws of the Nation, constitute theft. We have the acts of the defendant before us, and we are of opinion that the jury's construction of said law was correct; and there is no injury.

Third assignment. The court erred in not presenting affirmatively in the charge defendant's theory of the case, which was that he had purchased the horse from hands working for B. C. Evans, in Wise county. Bearing upon this matter, the court charged the jury: "When the possession of the property recently stolen is relied upon as a criminative fact, if such pos-

session is proven, and the person in whose possession such property is found, when his possession is first questioned, makes a reasonable explanation of his possession, the evidence must show that such explanation is false before such possession would, of itself, warrant a conviction." Appellant was found in possession of the stolen property. He explained by stating that he had purchased it from the hands of Evans, in Wise county. The purchase was his reasonable explanation of his possession. The jury were told that before his possession could be used against him, if reasonably explained, the evidence must show it false. Under the facts of this case, this charge was correct.

We find no error in the record, and the judgment is affirmed.

*Affirmed.*